
# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re<br><br>CYNTHIA LEE KAUANUI dba Jet Set Management Group,<br><br>    Debtor. | Case No. 14-00077<br>Chapter 7 |
| LINDSAY STEWART,<br><br>    Plaintiff,<br><br>  vs.<br><br>CYNTHIA LEE KAUANUI,<br><br>    Defendant. | Adv. Pro. No. 14-90018 |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial of this adversary proceeding was held on June 1 and 2, 2015. Acrivi Coromelas represented plaintiff Lindsay Stewart, and Steven Guttman and Dawn Egusa represented defendant Cynthia Lee Kauanui.

Based on the evidence received, I make the following

# FINDINGS OF FACT:

1. Defendant-Debtor Cynthia Lee Kauanui was the sole owner of Jet Set Management Group, Inc. ("Jet Set"), a talent agency representing models and actors, located in La Jolla, California.

2. In 2000, Plaintiff-Creditor Lindsay Stewart accepted employment with Jet Set as Director of Jet Set's Kids Division.

3. Ms. Kauanui regarded Ms. Stewart as a dedicated and loyal Jet Set employee from 2000 until about the time Ms. Stewart quit her job in August 2008.

4. In February 2007, Ms. Stewart asked Ms. Kauanui if she could work out of her home in Los Angeles. Ms. Kauanui approved Ms. Stewart's request for a period of six months. To memorialize their arrangement, Ms. Stewart and Ms. Kauanui signed a renewable agreement, permitting Ms. Stewart to work from Los Angeles from February to August 2007. The agreement provided that "Lindsay will be provided with necessary materials to conduct her job, and she will have access to her Jet Set computer as needed. She will also have use of a Jet Set laptop computer which will remain Jet Set's property." Jet Set, with Ms. Kauanui's approval, provided a laptop, telephone, office supplies, computer software, and remote access to computer databases for Ms. Stewart's use her home office.

5. Ms. Stewart later obtained, at Jet Set's expense, a fax machine and postage machine fo use at her home office. She obtained the postage machine in or

around March 2007, soon after she began working from her home office; the record does not indicate when she acquired the fax machine.

6. Ms. Kauanui continued to be happy with Ms. Stewart's work after she began working out of her home office.

7. In May 2007, Ms. Kauanui's son was beaten to death. Ms. Kauanui was understandably devastated by the loss of her child. A few months later, during the summer of 2007, Ms. Kauanui moved to Oahu, partly because she feared for her safety in La Jolla, and also because she needed time away to grieve.

8. While Ms. Kauanui was in Hawaii, she relied on Jet Set's employees to operate the business. She communicated with Jet Set employees about once a week and she communicated with Ms. Stewart only rarely. For part of her time in Hawaii, Ms. Kauanui was unable to receive emails.

9. Melissa Bennett was Jet Set's head of accounting.

10. In early 2008, some of Ms. Stewart's clients (the parents of children whose modeling services Ms. Stewart offered) began to complain that Jet Set was not paying them timely. Ms. Stewart attempted to get the problem solved. Ms. Stewart informed Ms. Kauanui about these complaints at least as early as April 2008. Ms. Kauanui responded that Jet Set was in a cash flow crunch.

11. Ms. Kauanui returned to Jet Set's La Jolla office in July 2008.

12. Initially, Ms. Kauanui still thought highly of Ms. Stewart. In a meeting

3

on or about July 25, 2008, Ms. Kauanui praised Stewart's loyalty and stated that Ms. Stewart was like "the daughter she never had."

13. Ms. Kauanui became convinced, however, that Ms. Bennett had embezzled money from Jet Set. Ms. Kauanui fired Ms. Bennett in late July or early August 2008.

14. After she fired Ms. Bennett, Ms. Kauanui began reading the emails in Ms. Bennett's account. She learned about things that had happened during her year away from the company. Some of that information made Ms. Kauanui very upset. Among other things, Ms. Kauanui learned from the emails that Ms. Kauanui was gay and was having a child with her partner.[1] Ms. Kauanui felt that Ms. Stewart and other Jet Set employees had been doing things behind her back.

15. While Ms. Kauanui was reading the emails in Ms. Bennett's account, she sent emails from the same account to Ms. Stewart and others which questioned in harsh and angry terms many things which Ms. Stewart and others did and discussed while Ms. Ms. Kauanui was in Hawaii.

16. Ms. Kauanui decided to make significant changes to Jet Set's operations. She brought in a human resources specialist named Jennifer Aronce and also hired a

---

[1] Ms. Kauanui claims that all of the evidence to this effect is inadmissible hearsay. I disagree. Ms. Paloma Jackson testified to this in her deposition taken in the state court litigation. Her deposition testimony is admissible under Fed. R. Evid. 804(b)(1). Her testimony about Ms. Ms. Kauanui's statements is admissible under Fed. R. Evid. 801(d)(2).

4

private investigator and accountants to investigate the embezzlement. On or about August 11, 2008, she announced that she would no longer permit Ms. Stewart and at least one other employee of Jet Set to work from home.

17. The next day, Ms. Stewart wrote to Ms. Kauanui that she could not work full time from La Jolla.

18. On August 18 or 19, 2008, Ms. Stewart received a fax from Ms. Aronce which requested Ms. Stewart to attend a meeting at Jet Set's office in La Jolla on Monday, August 25, 2008. The stated purpose of the meeting was "employee review." Jet Set asked Ms. Stewart to "release[]to Jet Set" at the meeting "all Model Contracts and Information sheets," "all intellectual Jet Set property (ie. Pitney Bowes Machine serial number, company passwords)," and a complete list of clients.

19. Ms. Stewart attempted to contact Ms. Aronce to reschedule the meeting, but did not reach her until August 25, 2008. During that conversation, Ms. Aronce told Ms. Stewart that Jet Set had hired a new child talent agent.

20. After speaking with Ms. Aronce, Ms. Stewart called Ms. Kauanui on August 25, 2008. There was no answer, so Ms. Stewart left a voicemail asking if she still had a job at Jet Set.

21. That same night, Ms. Kauanui left Ms. Stewart a long and angry voicemail. Ms. Kauanui stated that Jet Set was her company and she could do whatever she wanted. In summary, she told Ms. Stewart, "If you even want to work

U.S. Bankruptcy Court - Hawaii   #14-90018   Dkt # 109   Filed 08/05/15   Page 5 of 15

here, you're going to need to relocate back to San Diego. You're going to have to take a pay cut. We're going to redo the commission structure."

22.     Based on Ms. Kauanui's angry reaction to the emails she read in Ms. Bennett's account, the tone and content of Ms. Aronce's fax, the fact that Ms. Kauanui had hired another person to do the same job as Ms. Stewart, and Ms. Kauanui angry voicemail of August 25, 2008, Ms. Stewart was convinced that the true purpose of the meeting was to fire her. Ms. Stewart's fears were reasonable and well-founded. She decided to quit before she got fired. On August 26, 2008, she resigned from Jet Set's employ, effective immediately.

23.     Ms. Stewart arranged for the return of all Jet Set property and information on August 28, 2008.

24.     Shortly thereafter, Ms. Stewart formed her own company, called Zuri Model and Talent. Within a short time, about 150 of the Jet Set clients with whom Ms. Stewart worked moved their representation to Zuri. Ms. Stewart's economic relationships with these clients (through Zuri) were the source of Ms. Stewart's future livelihood.

25.     Ms. Kauanui realized that the loss of so many clients could devastate Jet Set. She immediately took steps to discourage clients from moving to Ms. Stewart's new business.

26.     Beginning within a day after Ms. Stewart quit, Ms. Kauanui spoke or

6

U.S. Bankruptcy Court - Hawaii   #14-90018   Dkt # 109   Filed  08/05/15   Page 6 of 15

sent emails directly to parents who had worked with Ms. Stewart. She apologized to the parents who had not been paid timely. She told the parents that, when she returned to the office, she found "moral and financial improprieties," that the accounting department had been stealing money, and that "they are under investigation along with our past kids booker." The "past kids booker" to whom Ms. Kauanui referred was Ms. Stewart, and most if not all of the parents who received Ms. Kauanui's communications knew that Ms. Kauanui was referring to Ms. Stewart. The investigation of Ms. Stewart to which Ms. Kauanui referred had to do with embezzlement of company funds, and most if not all of the parents who received Ms. Kauanui's communications understood that.

27. On September 2, 2008, an attorney representing Jet Set sent a letter to Ms. Stewart. The letter stated that Jet Set had retained the law firm "to begin a complete investigation as to your conduct while employed as a Kid Agent." The letter questioned expense reimbursements to Ms. Stewart during 2007-08. The letter said that:

> We are also investigating the breaches of duty and potential conversion and theft by other past Jet Set employees whom you had worked with while owner Cindy Kauanui was outside the state. . . . This includes obtaining or receiving money or goods which were not authorized by the owner of Jet Set. We are likewise concerned that your claimed

7

U.S. Bankruptcy Court - Hawaii   #14-90018   Dkt # 109   Filed  08/05/15   Page 7 of 15

"resignation" came abruptly at a time that this investigation was pending.[2]

28.     Ms. Kauanui's statements that Ms. Stewart was under investigation were true. Ms. Kauanui retained counsel and others to conduct the investigation. Ms. Bennett, and not Ms. Stewart, was the primary target of the investigation, but at least initially there was an investigation of Ms. Stewart.

29.     However, with at least three other people, Ms. Kauanui went further. She told these people, not just that Ms. Stewart was under investigation, but rather that Ms. Stewart had embezzled money from Jet Set.[3] (At trial, Ms. Kauanui denied making such statements, but I do not believe this testimony.)

30.     Ms. Kauanui's statements that Ms. Stewart had embezzled money from Jet Set were not true.

31.     Ms. Stewart intended to injure Ms. Stewart when she made these statements. She wanted to discourage people from doing business with Ms. Stewart rather than Jet Set. She knew that her statements were substantially certain to injure Ms. Stewart by causing people to doubt Ms. Stewart's honesty, trustworthiness, and

---

[2] Trial ex. Q.

[3] Deposition of Christiaan Michael Alamazan, a Jet Set employee, at 77-82; Deposition of Don Diaz, a photographer who sometimes hired Jet Set models, at 26-28; Deposition of Paloma Jackson, a Jet Set employee, at 148. Ms. Stewart offered declarations signed by parents and others describing other statements allegedly made by Ms. Kauanui. The declarations and their contents are hearsay and not subject to any exception. Therefore, they were not received in evidence to prove the truth of the matter asserted.

8

integrity.

32. In September 2008, Ms. Kauanui caused Jet Set to sue Ms. Stewart and Zuri in California state court. All of the claims in the first amended complaint, dated April 3, 2009, turned on the alleged misappropriation of proprietary information. Jet Set did not allege that Ms. Stewart embezzled any money from Jet Set.

33. Ms. Stewart filed a cross-complaint against Jet Set and Ms. Kauanui in the California state court litigation.

34. Ms. Kauanui voluntarily dismissed Jet Set's complaint, with prejudice, in the middle of the first day of her deposition. Ms. Stewart's cross-complaint remained pending. The California state court entered Ms. Kauanui's default due to discovery violations, and entered a default judgment against her in the amount of $2,560,000.00, including $500,000.00 of punitive damages.

Based on these findings of fact, I draw the following

## CONCLUSIONS OF LAW

### I. Jurisdiction and Venue

1. The court has personal jurisdiction over the parties and jurisdiction of the subject matter. The bankruptcy court has statutory and constitutional power to enter a final judgment. Venue is proper in this district.

9

U.S. Bankruptcy Court - Hawaii    #14-90018    Dkt # 109    Filed  08/05/15    Page 9 of 15

## II. Section 523(a)(6)

2. A debt "for willful and malicious injury by the debtor" is not dischargeable. To prevail, the plaintiff must establish both willfulness and malice by a preponderance of the evidence.[4]

3. The judgment which the California court entered in favor of Ms. Stewart and against Ms. Kauanui is a "debt."

### A. *"Willful Injury"*

4. An injury is "willful" if (1) "the debtor had a subjective motive to inflict the injury" or (2) "the debtor believed that injury was substantially certain to occur as a result of his conduct."[5] The touchstone of this standard is that the debtor must have intended to injure the creditor. It is not enough to prove that the debtor acted intentionally and caused an injury.[6]

5. Ms. Kauanui acted willfully. She intended to injure Ms. Stewart and to protect herself at Ms. Stewart's expense.[7]

6. Ms. Kauanui subjectively believed that her conduct was substantially

---

[4] *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F2d 551, 554 (9th Cir. 1991).

[5] *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1208 (9th Cir. 2001).

[6] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

[7] *Burks v. Bailey (In re Bailey)*, 499 B.R. 873, 894 (Bankr. D. Id. 2013), *rev'd in part on other grounds*, 518 B.R. 594 (D. Id. 2014) (injury was willful where debtor acted to bolster its own business and his acts were substantially certain to injure the plaintiff's business).

10

U.S. Bankruptcy Court - Hawaii   #14-90018   Dkt # 109   Filed 08/05/15   Page 10 of 15

certain to injure Ms. Stewart. She knew that her accusations would cause people to doubt Ms. Stewart's honesty, trustworthiness, and integrity and make it more difficult for Ms. Stewart to conduct her business.

### B. *"Malicious Injury"*

7. To prove that the debtor acted "maliciously," the creditor must show four elements: "'(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'"[8]

#### 1. <u>Defamation</u>

8. Numerous courts have held that claims for defamation *per se* are willful and malicious and therefore not dischargeable in bankruptcy.[9] The Ninth Circuit has held that libelous statements directed at a person's professional reputation satisfy the first three criteria of maliciousness.[10]

9. Under California law, defamation is "the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or

---

[8] *Jercich*, 238 F.3d at 1209 (quoting *In re Bammer*, 131 F.3d 788, 791 (9th Cir.1997) (en banc)).

[9] *See Peck v. Maaskant (In re Peck)*, 295 B.R. 353, 365 (B.A.P. 9th Cir. 2003) (finding slander per se willful because the debtor accused the creditor of a crime for the debtor's gain); *see also Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 583 (6th Cir. 2001) ("[T]he statements at issue are defamation per se under Michigan law, meaning that the courts presume that the speakers make such statements knowing that substantial harm or injury will result."); *Nat'l Sign & Signal v. Livingston*, 422 B.R. 645, 658 (W.D. Mich. 2009); *Muse v. Day (In re Day)*, 409 B.R. 337, 343-44 (Bankr. D. Md. 2009).

[10] *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101 (9th Cir. 2005); *see also Khaligh v. Hadaegh (In re Khaligh)*, 338 B.R. 817, 831 (B.A.P. 9th Cir. 2005).

U.S. Bankruptcy Court - Hawaii   #14-90018   Dkt # 109   Filed 08/05/15   Page 11 of 15

which causes special damage."[11]

10. Publication "to a single individual is sufficient."[12] However, "'it is not necessary that anyone believe [the defamatory statement] to be true . . . .'"[13]

11. A defendant's showing of "the truth of the offensive statements or communications is a complete defense against civil liability, regardless of bad faith or malicious purpose."[14]

12. There are two types of defamation: defamation *per quod* and defamation *per se*. Defamation *per se* is "actionable without proof of special damages."[15]

13. The criteria for defamation *per se* depend on whether the statements are published orally (slander) or in writing (libel).

14. Slander *per se* applies to only four categories of statements, one of which is an oral publication that "[c]harges any person with crime, or with having been indicted, convicted, or punished for crime."[16] Slander *per se* includes calling an individual a thief or a crook or making statements to the effect that a plaintiff had

---

[11] *Smith v. Maldonado*, 72 Cal. App. 4th 637, 645 (2d Dist. 1999); *Taus v. Loftus*, 40 Cal. 4th 683, 720 (2007).

[12] *Smith*, 72 Cal. App. 4th at 645.

[13] *Peck*, 295 B.R. at 361.

[14] *Smith*, 72 Cal. App. 4th at 646.

[15] *Burrill v. Nair*, 217 Cal. App. 4th 357, 382–83 (3d Dist. 2013).

[16] Cal. Civ. Code § 46; *Burrill*, 217 Cal. App. 4th at 382.

12

U.S. Bankruptcy Court - Hawaii   #14-90018   Dkt # 109   Filed 08/05/15   Page 12 of 15

stolen money.[17]

15. Libel *per se* exists wherever the publication exposes a plaintiff "to contempt and ridicule on its face."[18] The four categories do not apply. False accusations of dishonesty, thievery, or embezzlement constitute libel *per se*.[19]

16. Ms. Kauanui committed slander *per se*.

   a. She intentionally told at least three people that Ms. Stewart had embezzled or misappropriated funds from Jet Set. These statements were false and unprivileged. These false accusations had a natural tendency to injure Ms. Stewart, and did in fact injure Ms. Stewart (as the state court's judgment determines).

   b. Her statements were slander *per se* because she charged Ms. Stewart with a crime and said that she had stolen money.

17. Thus, the first three elements of the definition of "malicious" are met.

18. The fourth element is also met. Ms. Kauanui had no just cause or excuse for making these statements. Her grief for her son sometimes understandably disturbed her emotional state, but her pain cannot excuse her choice to inflict pain on Ms. Stewart.

---

[17] *Albertini v. Schaefer*, 97 Cal. App. 3d 822, 829–30 (2d Dist. 1979); *Douglas v. Janis*, 43 Cal. App. 3d 931, 938-39 (2d Dist. 1974).

[18] *Smith*, 72 Cal. App. 4th at 651.

[19] *Burrill*, 217 Cal. App. 4th at 383; *Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1127 (2003) ("[F]alse accusations of crime are libel per se.").

13

### 2. IIPEA

19. Ms. Kauanui's conduct also amounts to the intentional interference with prospective economic advantage ("IIPEA") under California law.

20. The elements of an IIPEA claim are the following: "'(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant.'"[20]

21. The defendant's act "must be wrongful by some legal measure, rather than merely a product of an improper, but lawful, purpose or motive."[21]

22. Ms. Stewart had economic relationships with the parents of the models and with the photographers, producers, and others who hired Ms. Stewart's clients. These relationships gave Ms. Stewart the prospect of earning a living in the future. Ms. Kauanui knew of these relationships and intentionally made defamatory statements about Ms. Stewart for the purpose of disrupting Ms. Stewart's business relationships. These statements impaired Ms. Stewart's relationships with her clients

---

[20] *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1153 (2003) (quoting *Westside Center Assocs. v. Safeway Stores 23, Inc.*, 42 Cal. App. 4th 507, 521–22 (1996)).

[21] *Korea Supply Co.*, 29 Cal.4th at 1159 n.11 & 1153 ("[A] plaintiff . . . must plead and prove . . . the defendant's conduct was 'wrongful by some legal measure other than the fact of interference itself.'" (quoting *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 393 (1995))).

U.S. Bankruptcy Court - Hawaii   #14-90018   Dkt # 109   Filed 08/05/15   Page 14 of 15

and others and proximately caused harm to Ms. Stewart.

23. Ms. Kauanui's intentional interference with Ms. Stewart's prospective economic advantage is a "wrongful act" within the meaning of section 523(a)(6).

24. Ms. Kauanui made these statements intentionally. This was not a "slip of the tongue," but rather was a calculated effort to protect her business at the expense of Ms. Stewart's.

25. The California court determined that Ms. Stewart sustained damages because of Ms. Kauanui's actions, and I have already ruled that judgment bars Ms. Kauanui from re-litigating this issue.[22]

26. As in the case of the defamation claim, Ms. Kauanui had no just cause or excuse for her efforts to interfere with Ms. Stewart's business.

27. Thus, Ms. Kauanui's intentional interference with Ms. Stewart's prospective economic advantage was willful and malicious within the meaning of section 523(a)(6).

## CONCLUSION

Ms. Kauanui's debt to Ms. Stewart under the judgment is not dischargeable in bankruptcy. Ms. Stewart's counsel shall prepare a proposed judgment.

## END OF FINDINGS AND CONCLUSIONS

---

[22] Dkt. 39 at 12.

U.S. Bankruptcy Court - Hawaii    #14-90018    Dkt # 109    Filed 08/05/15    Page 15 of 15